United States District Court
Southern District of Texas
**ENTERED**
May 07, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROSA BALDERAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:22-CV-00255 |
| | § | |
| DENIS MCDONOUGH, | § | |
| | § | |
| Defendant. | § | |

*Balderas*, Case No. 2:22-cv-00255

## <u>MEMORANDUM AND RECOMMENDATION</u>

In October 2022, Plaintiff Rosa Balderas filed this employment discrimination suit against Defendant Dennis McDonough, Secretary of the United States Department of Veterans Affairs ("the VA"), alleging employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Rehabilitation Act ("RA"), and retaliation in violation of Title VII. Now pending is the VA's motion for summary judgment, to which Balderas has responded. (D.E. 21, 25).

For the reasons discussed further below, it is recommended that the VA's motion (D.E. 21) be **GRANTED in part** and **DENIED in part**.

### I.   *BACKGROUND*

#### a.   **Complaint**

Balderas alleges the following in her complaint.  (D.E. 1).  She is a Mexican-American female who, at the time of the incidents alleged in the complaint, was 65 years old.  (*Id.* at 3).  She suffered from several disabilities that the VA was aware of, including interstitial cystitis, attention deficit hyperactivity disorder ("ADHD"),[1] and depression.  (*Id.*).  Balderas worked as a Social Worker Case Manager for Homeless Veterans in the Health Care for Homeless Veterans Program ("HCHV"), and her responsibilities included: (1) working with organizations to place homeless veterans in shelters; (2) conducting outreach with community and government organizations to ensure that she was aware of all programs available to homeless veterans; (3) managing cases of homeless veterans including scheduling mental and physical health appointments, completing benefits applications, and obtaining housing; (4) meeting with individual veterans to assess their mental health status and provide counseling; (5) attending VA internal meetings and external community meetings, collecting essential items to be distributed to veterans, and reviewing other staff's client files; and (6) documenting and entering case management and social work notes into VA software.  (*Id.* at 3-5).

Carrie Myers, a younger white female, was Balderas's immediate supervisor and was aware of her medical conditions.  (*Id.* at 5).  Chris King, a white male, was a similarly

---

[1] The complaint, evidence, and briefing alternate between referring to Balderas's disorder as attention deficit disorder and attention deficit hyperactivity disorder.  This memorandum will refer to the disorder as ADHD.

situated employee who worked in the same position as Balderas and was treated better. Myers subjected Balderas to harassment and a hostile work environment on several occasions by questioning whether she had been assessed for early onset dementia. King was never questioned about his mental ability to recall information. Myers also subjected Balderas to harassment and a hostile work environment by assigning Nicole Theriot, a Social Worker Supervisor, to provide her training and then measure the information Balderas retained for the purpose of determining her mental recall of information. King was not subjected to this type of questioning. (*Id.*). Between March 2018 and December 2018, Myers also audited Balderas's work charts on a nearly daily basis and she was treated less favorably than other employees, including King. (*Id.* at 5-6).

Myers's behavior caused Balderas to miss work more frequently due to stress, anxiety, and depression, and exacerbated interstitial cystitis flare-ups. (*Id.* at 6). Myers knew other employees frequently made mistakes, but their charts were not reviewed as frequently. Myers accused Balderas of completing patient records forms incorrectly, but Balderas had never been questioned about her documentation before Myers became her supervisor, and King was not questioned. (*Id.*). Myers made disparaging comments about Mexican-Americans, including that she could not understand the documentation by case managers from Harlingen and McAllen, all of whom were Mexican-American. (*Id.* at 6-7). Myers sent excessive emails and Skype messages that she, as a licensed professional counselor, knew would exacerbate Balderas's ADHD, anxiety, and depression. (*Id.* at 7). In May 2018, Myers accused Balderas of fraud and directed her to correct her 2017 case

records.  (*Id.*).  Myers used Balderas's ADHD against her by questioning whether her issues with a CPR course were due to her mental capabilities.  (*Id.* at 8).  From July to September 2018, Myers placed Balderas on a 60-day trial period to evaluate her competency.  Balderas was not allowed to get assistance from any other employee.  Myers was supposed to provide feedback after 60 days, but never did so.  In October 2018, Theriot rated Balderas's social work competencies as proficient.  (*Id.*).  While grieving the death of her brother and recovering from a surgery, Balderas sought to use a community assistance program rather than internal VA services, but Myers denied her request.  (*Id.* at 8-9).  Myers also discriminated against Balderas based on race and national origin by saying that she did not like to express her feelings or be dramatic like "Hispanic folk."  (*Id.* at 9).

In October 2008, Balderas sent a letter to Dr. Jennifer Wood, the Associate Chief of Staff for Mental Health and the Homeless Program Manager, where she discussed the stress she was under at work and requested assistance and advice regarding the adverse treatment. (*Id.*).  Following this email, the VA retaliated against Balderas by limiting face-to-face communication, increasing emails and Skype messages, decreasing her community participation and homeless-related activities, attempting to falsely charge Balderas as AWOL, contacting outreach facilities to verify Balderas's presence, and directing the senior social worker to review Balderas's caseload and submit a report of errors with corrections.  (*Id.*).  King was not treated this way, and was allowed to take meetings on his walk-in coverage days, but Balderas was required to be in the office all day.  (*Id.* at 10). On December 6, 2018, Myers issued Balderas a letter of proposed termination.  Balderas's

union representative informed her that if she challenged the termination, it could adversely affect her and she could lose her retirement benefits.  Due to the proposed termination, Balderas was forced to retire.  (*Id.*).  Following her retirement, Myers still retaliated against and harassed her by falsely accusing her of document theft, resulting in a search of Balderas's home.  (*Id.* at 11).

Balderas alleges race and national origin discrimination under Title VII, retaliation, disability discrimination, and age discrimination.  (*Id.* at 11-12).  She alleges that she was subject to a hostile work environment and disparate treatment.  (*Id.*).

**b.   Summary Judgment Evidence**

*i.  Documents*

On two occasions in March and April 2018, Myers emailed Balderas because she had not yet arrived at work when expected.  (D.E. 21-4 at 14-15).  In April 2018, Myers emailed Balderas about setting up a meeting to discuss performance issues.  (*Id.* at 4).  An initial meeting occurred in April 2018 between Myers, Balderas, and a union representative where additional training was discussed.  (*Id.* at 11).  A second meeting occurred in May 2018 to address concerns raised by Balderas's union representative about the training plan. (*Id.* at 6-8).  After the May meeting, Myers sent a summary email noting that they had discussed a training plan and a 60-day observation period intended to help Balderas function independently in her job.  (*Id.* at 6).  If Balderas continued to have performance issues after the training, then progressive discipline could be issued.  (*Id.*).  Balderas and Theriot discussed scheduling training on several occasions in July 2018.  (*Id.* at 9, 13).

In July 2018, Balderas agreed to a training plan that addressed competencies that she was rated as needing improvement in. (*Id.* at 1-3). These included training on computer software, encounter notes, call center training, Excel training, use and maintenance of her work cell phone, logging into her workstation, and properly completing forms and notes. (*Id.*).

On December 14, 2018, Balderas submitted a letter indicating that she was retiring effective immediately. (D.E. 21-5 at 1).

### ii. Affidavits

Balderas stated the following in a June 2019 affidavit. (D.E. 21-1). Her disability limited her ability to do things in everyday life when she had flare-ups, and the working environment at the VA contributed to her anxiety and ADHD. (*Id.* at 5). Myers knew of her disabilities since 2014. (*Id.* at 7). In December 2017, March 2018, and May 2018, Myers asked Balderas if she had ever been assessed for early onset dementia. (*Id.* at 8). Myers asked this because she believed Balderas was forgetting to follow up on phone calls and to keep her work documentation up to date. No one witnessed Myers's statements, but Balderas discussed them with other employees. (*Id.*). Balderas believed Myers asked her this question due to her age because she was the oldest employee and Myers did not question younger employees who also forgot tasks. (*Id.* at 9). Between March 2018 and December 2018, Myers audited Balderas's charts on a frequent basis and told her that she was doing them wrong. (*Id.* at 9-10). Balderas responded that her documentation was consistent with how she was trained by the Social Work Case Manager. (*Id.*). Myers did

not audit any other employee's charts at the same frequency, and Balderas believed she was merely attempting to justify a termination. (*Id.* at 10). Myers audited her charts weekly and sometimes daily. Balderas believed her age was a factor because other staff members made frequent mistakes without the same level of review and were not asked about memory problems. She believed her disabilities were a factor because she missed work on a more frequent basis due to stress, anxiety, depression, and interstitial cystitis flare-ups. (*Id.*). She believed her national origin was a factor because Myers told her she could not understand her documentation or the documentation of case managers from Harlingen and McAllen, who were all Hispanic. (*Id.* at 10-11).

Balderas further stated that Myers accused her of fraud in May 2018 and required her to make corrections and additions to her 2017 caseload. (*Id.* at 11). Myers stated that her HCHV documentation was wrong and wanted it done under the Housing and Urban Development-Veterans Affairs Supportive Housing ("HUDVASH") standard, but that program had a different scope and criteria. (*Id.*). Balderas believed her age was a factor when this occurred because no other employees were asked to correct their files. (*Id.* at 12). In June 2018, Myers asked Balderas if she had problems keeping up with the computer instructions on a CPR course, but Balderas passed the course and only had issues with her physical form. (*Id.* at 13). Balderas believed her age and disability were factors because Myers had previously questioned her ability to remember information and was aware of her ADHD. (*Id.* at 14). From July to September 2018, Myers placed Balderas on a 60-day training plan but did not provide any feedback throughout this period or after. (*Id.* at 14-

15).  In September 2018, Myers denied Balderas's request to use a community assistance program rather than the VA's internal services, stating that the request would be denied by Dr. Wood.  (*Id.* at 16).  Balderas believed that her national origin was a factor in this decision because Myers had previously expressed that she did not like to express her feelings or be dramatic like Hispanic people.  (*Id.* at 17).

Balderas further stated that, in October 2018, Myers retaliated against her by limiting face-to-face communications, increasing emails and Skype messages, decreasing Balderas's community participation, attempting to charge Balderas as AWOL on three occasions even though she was present, and calling community and outreach contacts to verify Balderas's presence.  (*Id.* at 18-20).  Although King was allowed to attend meetings during his walk-in coverage days, Balderas was required to be in the office all day.  (*Id.* at 18).  In October and November 2018, Myers directed a senior social worker to review Balderas's caseload weekly and submit a report of errors with corrections.  (*Id.* at 21-22).  On December 6, 2018, Myers issued Balderas a letter of proposed termination, stating that she had not made any improvement following the training plan earlier in the year.  (*Id.* at 23).  Balderas believed that her age and disability were factors given Myers's previous comments about her memory.  (*Id.* at 24).  On December 14, 2018, Balderas retired prior to her termination to avoid losing her retirement benefits and licenses.  (*Id.* at 25).  Balderas did not plan to retire in 2018 and felt that she could still complete her job responsibilities.  (*Id.* at 25-26).  Balderas believed that her age and disability were factors because other coworkers did not receive the same scrutiny and oversight as her.  (*Id.* at 28).  She believed

that her national origin was a factor due to Myers's comment about her having problems with documentation like the case workers from Harlingen and McAllen. (*Id.*). On January 3, 2019, Myers sent a special agent to Balderas's home after alleging that Balderas took official veteran documents home. (*Id.* at 29). The case was dismissed and no documents were found. (*Id.*).

Myers stated the following in a June 2019 affidavit. (D.E. 21-2). She was a 40-year-old white woman. (*Id.* at 2, 4). She was aware of Balderas's interstitial cystitis because Balderas informed her of it and used intermittent leave for it, and Balderas had mentioned her other medical issues in passing. (*Id.* at 3). Balderas's disability made it difficult for her to arrive on time, impaired her memory, incapacitated her at times, prevented her from driving at times, and caused pain that prevented her from arriving or caused her to leave for the day. (*Id.*). Balderas was not able to complete essential duties of her position, including proper documentation, proper coding, making accurate notes in the chart in a timely manner, completing outreach events, and submitting reports on time. (*Id.* at 4). However, Myers did not believe that Balderas's disabilities impacted these duties. She did not know Balderas's exact age, but Balderas told her she was eligible for retirement sometime in the summer of 2018. She knew Balderas's national origin because she spoke of being Hispanic and was responsible for Hispanic Awareness Month events. (*Id.*). Myers denied ever asking Balderas if she had been assessed for early onset dementia. (*Id.* at 5). Instead, Balderas often discussed her memory issues unprompted. (*Id.*). Myers audited Balderas's charts on a frequent basis between March 2018 and December 2018

because the call center and other staff members reported many errors in her charting. (*Id.* at 6). Balderas was placed on a training plan and her work was reviewed accordingly. (*Id.* at 6-7). Myers had taken similar actions with others in the workplace, including a 30-year-old white female. (*Id.* at 7).

Myers further stated that she emailed Balderas in May 2018 to inform her that there were errors in her documentation that needed to be corrected because double billing could be misconstrued as fraud. (*Id.*). She did not accuse Balderas of fraud, but rather asked her to correct the documentation. (*Id.*). All staff occasionally made errors and were notified as necessary. (*Id.* at 7-8). Myers did not question whether Balderas had failed a CPR course due to her mental abilities, but rather told her that they could request a special waiver for the hands-on portion after Balderas told her she had difficulty due to her wrist. (*Id.* at 8). Balderas was placed on a training plan and Myers provided feedback through email and Skype. (*Id.* at 9). Myers did not have the authority to deny community assistance services, but she did review agency policy with Balderas, which stated that she could choose an outside provider, but at no cost to the government. (*Id.* at 10). Myers denied retaliating against Balderas. (*Id.* at 11-12). She called a facility that Balderas was supposed to be at because Balderas was not answering her work or personal cell phone. (*Id.* at 12). Myers directed a senior social worker to review Balderas's case load because a new contract had just taken effect and all HCHV cases were reviewed for errors in billing and documentation. (*Id.* at 13). The same was true for King, a white male in his 30s who also had a disability. (*Id.* at 14).

Myers further stated that she issued a letter of proposed termination in December 2018 because Balderas had not shown she could meet the requirements for proper documentation and social work competencies addressed in the training plan. (*Id.*). Balderas reportedly left VA property with working files and printed copies of Skype messages that had personal health information on them. (*Id.* at 18). Myers reported this to a privacy officer, and from what she understood, the documents were recovered and returned. (*Id.*).

Theriot stated the following in an August 2019 affidavit. (D.E. 21-3). Myers placed Balderas on a 60-day training plan that was created in conjunction with Theriot. (*Id.* at 3). Theriot was assigned to review and assess Balderas's social work competencies. Theriot and Myers provided ongoing feedback during the timeframe of the training plan. After completion of the training plan, Balderas was required to show independent performance of her tasks with minimal errors over a 90-day period. (*Id.*). However, she was only able to maintain independent performance without errors for a short time and then began making the same errors as before the training plan. (*Id.* at 4). Myers had previously placed a white female in her 30s on a similar training plan. (*Id.*). Theriot did not believe that Balderas's age, disability, or national origin were connected to the training plan, but rather Balderas was unable to perform tasks that were required of her position, including tasks that impacted patient care and safety. (*Id.* at 5).

Balderas stated the following in a December 2023 affidavit. (D.E. 25-1). In the fall of 2017, she passed out at her desk due to pain and was transferred to the hospital. (*Id.* at

3).   Myers witnessed the incident, but never offered any reasonable accommodation to Balderas's disability.   Balderas's previous supervisor offered to change Balderas's schedule so she could arrive later in the morning, but this never happened because Myers became her supervisor.   At some time, Myers called the Chief of Social Work in Harlingen to inquire about where Balderas was rather than asking Balderas's direct supervisor.   Myers knew about Balderas's ADHD diagnosis, but nonetheless asked her on several occasions if she had dementia, questions that Balderas also felt were related to her age.   As a result of Myers's harassment, Balderas suffered from further anxiety and sought a medical evaluation for dementia.   A doctor re-diagnosed her with ADHD and a depressive disorder and recommended psychotherapy.   Myers made it difficult for Balderas to complete her job responsibilities and she was the only case worker who received frequent emails and Skype messages about completion of her work.   In one instance when Myers was not in the office, Balderas attempted to determine who her acting supervisor was, but was unable to.   As a result of this miscommunication, when Myers returned to the office, she attempted to charge Balderas with eight hours of unpaid leave.   (*Id.*).   Balderas was the only HCHV employee who worked after hours, but Myers harassed her about this in a meeting by saying that she must have bad time management skills if she worked later than 6:30.   (*Id.* at 4). Balderas sent a letter to Dr. Wood, Myers's supervisor, in October 2018, in which she discussed the harassment and stated that she felt isolated and demoralized.   No other similarly situated employee was subject to the same amount of scrutiny over their work, including King.   (*Id.*).

12 / 31

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  The Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274-75 (5th Cir. 2016).  In doing so, the Court can credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.

## III.  DISCUSSION

### a.  *Title VII Race or National Origin*

In the motion for summary judgment, the VA argues that Balderas has not shown an adverse employment action that could form the basis of a Title VII discrimination claim. (D.E. 21 at 8).  The VA argues that Balderas was subject to normal managerial oversight and placed on a training plan and that Balderas's claim regarding EAP services is unsupported.  (*Id.* at 8-9).  Further, the VA argues that, even if Balderas did suffer an adverse employment action, there was a legitimate, non-discriminatory reason for it, namely that Balderas was placed on a training plan and was still unable to carry out her assigned tasks.  (*Id.* at 9-10).

Balderas responds that the former employee that Myers identified as being treated similarly was not a good comparator because she was white and was not employed in 2018. (D.E. 25 at 3).  Similarly, Balderas argues that King, a younger white male, was not subjected to the same level of scrutiny regarding his job performance.  (*Id.*).  She contends that Myers made several comments directed at her race and national origin, including: (1) stating that she could not understand the documentation by Balderas or the case

managers from McAllen and Harlingen, all of whom were Hispanic; and (2) stating that she did not like to be dramatic like Hispanic people.  (*Id.* at 10-11).

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  When a person or persons with decision making authority evinces racial animus that may constitute direct evidence of discrimination.  *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).  "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Russell*, 235 F.3d at 222.  Under this burden-shifting framework, the plaintiff must first prove a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To do this, the plaintiff must show that: (1) she belongs to a protected class; (2) was qualified for her position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or that other similarly situated persons were treated better.  *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).  If the plaintiff successfully shows a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate,

nondiscriminatory reason for" the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802; *Septimus*, 399 F.3d at 609.  If the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that this reason was merely a pretext for discrimination.  *Septimus*, 399 F.3d at 609.

To show an adverse employment action, a plaintiff must present evidence "showing discrimination in hiring, firing, compensation, or in the 'terms, conditions, or privileges' of his or her employment." *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 502-03 (5th Cir. 2023). The statutory phrase "terms, conditions, or privileges of employment" is broad and not limited to only economic or tangible discrimination. *Id.* at 503.

An employee may be "constructively discharged" "when the employer made conditions so intolerable that the employee reasonably felt compelled to resign." *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983).  This question requires the court to determine "whether or not a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 481 n.12.  This is based solely on an analysis of the conditions imposed, not the employer's motive. *Id.*  Where an employer threatens a termination and the employee shows facts "that make plausible the contention that a rational employee would have resigned or retired," the adverse action requirement is met. *Ross v. United States Capitol Police*, 195 F. Supp. 3d 180, 203 (D.D.C. 2016); *see also Hanks v. Shinseki*, No. 3:08-1594-G, 2010 WL 3000835, at *1 n.2, *5 (N.D. Tex. July 28, 2010) ("An adverse

employment action occurred when [the plaintiff] was put to the decision of either retiring or being terminated.")

After the employee makes a prima facie case of discrimination, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse action. *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021). The employer carries only the burden of production at this stage, not a burden of persuasion, and the employer must "articulate a nondiscriminatory reason with sufficient clarity to afford [the employee] a realistic opportunity to show that the reason is pretextual." *Id.* (internal citation omitted). Poor work performance is an adequate nondiscriminatory reason if specific examples are provided. *Id.*

After the employer meets its burden to show a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to the employee to show that this reason was merely a pretext for discrimination. *Id.* To do so, the employee must produce substantial evidence that the proffered reason is discriminatory, which requires evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 283 (internal citation omitted). An employee may establish pretext either by showing disparate treatment or by showing that the proffered explanation is false or "unworthy of credence." *Id.* "[E]vidence must be of sufficient nature, extent, and quality to permit a jury to reasonably infer discrimination." *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (internal quotation marks omitted). To establish pretext through disparate treatment, an employee must

produce evidence of a comparator who was similarly situated to her. *Id.* at 827. A showing that another employee is similarly situated must be based on more than merely job titles. Conclusory declarations from the plaintiff are not sufficient to create an issue of fact, and the plaintiff must have some factual basis to support her conclusions. *Id.*

Here, the evidence shows a genuine issue of material fact as to whether Balderas suffered an adverse employment action. This is the only stage of Balderas's prima facie case that the VA has challenged. (D.E. 21 at 7-10). However, although Balderas has established a prima facie case of discrimination, the VA has proffered a legitimate, nondiscriminatory reason for her proposed termination, and Balderas has not met her burden to show that this reason was merely a pretext for discrimination.

As to an adverse employment action, when taking the evidence in a light most favorable to Balderas as the non-moving party, she suffered an adverse employment action when Myers issued a letter of proposed termination seeking to end her employment. (D.E. 21-1 at 23; D.E. 21-2 at 14). Balderas stated that she opted to retire rather than contesting the termination because she was warned that contesting could carry other consequences, including losing her social work license or losing her retirement benefits. (D.E. 21-1 at 25). She stated that she had no intention of retiring at that time absent the letter of proposed termination. (*Id.* at 25-26). None of these facts are in dispute from the evidence presented. Where an employer threatens a termination and the employee shows facts "that make plausible the contention that a rational employee would have resigned or retired," she satisfies the adverse action requirement. *Ross*, 195 F. Supp. 3d at 203; *see also Hanks*,

2010 WL 3000835, at *1 n.2, *5.  The evidence shows that Balderas was under the impression that contesting the proposed letter of termination could result in additional consequences, and it is plausible that a rational employee would have retired rather than contesting termination or waiting to be terminated.  Thus, regardless of whether any of Balderas's other claimed adverse employment actions are sufficient, the issuance of the proposed letter of termination creates a genuine issue of material fact regarding whether Balderas was subjected to an adverse employment action, and she has met her burden to show a prima facie case of discrimination.

However, the VA has proffered a legitimate, non-discriminatory reason for the letter of proposed termination and other alleged adverse employment actions, and Balderas has not met her subsequent burden to show that this reason is merely pretextual.  Specifically, the VA asserts and presents evidence that Balderas's proposed termination was due to unsatisfactory work performance and mistakes.  This is supported by Myers's affidavit, Theriot's affidavit, and a copy of the training plan itself.  (D.E. 21-4 at 1-4, 6; D.E. 21-2 at 4, 6-9, 14; D.E. 21-3 at 4-5).  Poor work performance is a legitimate, non-discriminatory reason for an adverse action.  *Watkins*, 997 F.3d at 282.

Balderas argues that this reason was merely a pretext, but the evidence submitted does not meet her burden to show either disparate treatment or that the proffered explanation is false or "unworthy of credence."  *Id.* at 283.  The only evidence Balderas presents in support of her argument are her own affidavits.  As for disparate treatment, Balderas does not sufficiently identify another similarly situated employee who was treated

differently than her.  *Owens*, 33 F.4th at 827.  The only employee she mentions by name is King, but their shared job title is insufficient to show that they were similarly situated.  (*See generally* D.E. 21-1; D.E. 25-1); *Owens*, 33 F.4th at 827.  And while she testified that King, and other unidentified employees, were not placed under the same type of scrutiny as her for their mistakes, she has presented no specific evidence in support of this conclusory statement.  (D.E. 21-1 at 10, 18, 28; D.E. 25-1 at 4); *Owens*, 33 F.4th at 827.  As for evidence that the VA's reason is unworthy of credence, Balderas relies on two comments by Myers.  First, Balderas testified that Myers once stated that she did not like to express her feelings or be dramatic like Hispanic people.  (D.E. 21-1 at 17).  Second, Myers once told Balderas that she could not understand her documentation or the documentation from caseworkers in Harlingen and McAllen, who Balderas noted were all Hispanic.  (*Id.* at 10-11).  These two stray comments do not meet Balderas's burden of producing substantial evidence that her work mistakes, which she has not contested, were merely used by the VA as a pretext for discrimination.[2]

Accordingly, because Balderas has not shown that the VA's legitimate, non-discriminatory reason was merely a pretext, it is recommended that the VA's motion be granted on her Title VII race and national origin claims.

---

[2] These comments are also not direct, rather than circumstantial, evidence of discrimination.  In neither comment did Myers or the VA state that any adverse employment action was taken as a result of Balderas's race or national origin.  *See, e.g., Wilkinson v. Pinnacle Lodging, L.L.C.*, No. 22-30556, 2023 WL 6518142, at *3 (5th Cir. Oct. 5, 2023) (discussing the direct evidence standard and citing cases).

>    *b.    Hostile Work Environment*

As to Balderas's hostile work environment claim, the VA argues that none of Balderas's allegations rise to the level of harassment that was so severe or pervasive as to amount to a change in the terms and conditions of her employment.  (D.E. 21 at 10-12).

Balderas responds that Myers harassed her by accusing her of incorrect documentation, auditing her work far more frequently than any other employee, and attributing Balderas's mistakes to dementia.  (D.E. 25 at 4).  She argues that Myers then placed her on a training plan that was not used previously or used with any other similarly situated employee in 2018.  Balderas contends that Myers exacerbated her depression and anxiety by subjecting her to a weekly review by a Senior Social Worker.  (*Id.*).  Balderas asserts that Myers also harassed her by questioning her arrival to work, accusing her of fraud, and denying her request for outside EAP services, even though Myers knew about her disabilities and how they affected her performance.  (*Id.* at 5-6).  Balderas argues that Myers's conduct was severe and had the effect of altering the terms and conditions of her employment by increasing her anxiety and ADHD symptoms.  (*Id.* at 11-12).

"Hostile work environment is a specific discrimination claim under Title VII." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 229 (5th Cir. 2023).  "When a workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Id.* (internal quotation marks and citations omitted).  "To establish a claim of hostile work environment, a plaintiff must prove [s]he

(1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [her] membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399-400 (5th Cir. 2021). "Harassment is sufficiently severe or pervasive enough to create a hostile work environment when it is objectively hostile or abusive—meaning an environment that a reasonable person would find hostile or abusive—and is subjectively perceived by the victim as abusive." *Id.* at 400 (internal quotation marks and citations omitted). The objective inquiry must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

However, Title VII is not a "general civility code," and "simple teasing," offhand comments, and isolated incidents are not sufficient to alter the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022). Further, "criticism of an employee's work performance does not satisfy the standard for a harassment claim" where "the record demonstrates deficiencies in the employee's performance that are legitimate grounds for concern or criticism." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021).

Here, Balderas has not shown harassment based on her race, national origin, age, or disability that is so severe or pervasive as to amount to a change in the terms and conditions of her employment. First, to the extent that Balderas relies on Myers's questioning of her documentation, auditing her work, and putting her on a training plan, these actions do not satisfy the standard for a harassment claim because the record demonstrates deficiencies in Balderas's performance that are legitimate grounds for concern or criticism. *Thompson*, 2 F.4th at 471. The evidence in the record includes e-mails from Myers to Balderas inquiring about her late arrival at work, several meetings about Balderas's work performance, and a training plan agreed to by Balderas with the help of a union representative. (D.E. 21-4 at 1-4, 6, 9, 11, 13-15). This evidence is uncontested, and Balderas does not dispute her work mistakes in either her affidavits or her briefing.

As for offensive comments, taking the evidence in a light most favorable to Balderas as the non-moving party, Myers: (1) questioned whether Balderas had been checked for early onset dementia three times over a five-month period; (2) stated that she could not understand the documentation by Balderas or the case managers from Harlingen and McAllen, who were all Hispanic; and (3) stated that she did not like to express her feelings or be dramatic like Hispanic people. (D.E. 21-1 at 8, 10-11, 17). Considering the entirety of the circumstances, the evidence submitted does not show that these comments were especially frequent or severe, and they were merely offensive utterances rather than anything physically threatening or humiliating. *Harris*, 510 U.S. at 23. Further, although Balderas states in her affidavits that Myers's comments interfered with her work

performance by exacerbating her ADHD, anxiety, and interstitial cystitis symptoms, she has provided no evidence or details regarding how these affected her work performance. (D.E. 25-1 at 3).  Conclusory declarations from the plaintiff are not sufficient to create an issue of fact, and the plaintiff must have some factual basis to support her conclusions. *Owens*, 33 F.4th at 827.  The evidence submitted does not establish harassment sufficiently severe or pervasive to create a hostile work environment, but rather shows offhand comments and isolated incidents.

Accordingly, because Balderas has not met her burden to show that a genuine issue of material fact exists regarding whether the harassment was so severe or pervasive as to amount to a change in the terms and conditions of her employment, it is recommended that the VA's motion be granted on her hostile work environment claim.

### c.   *ADEA and RA*

The VA argues that the sole basis for Balderas's age discrimination claim is that Myers asked her if she had ever been assessed for early onset dementia and she was the oldest employee in the program.  (D.E. 21 at 5).  The VA contends that Myers denied ever inquiring into Balderas's condition and stated that Balderas brought up her memory issues on her own.  (*Id.* at 6).  As to disability discrimination, the VA argues that there is no evidence to support that Myers questioned her mental capacity in relation to the CPR test. Thus, the VA contends that there is no genuine issue of material fact regarding either claim and Balderas has not shown discrimination.  (*Id.*).

Balderas responds that a genuine issue of material fact exists regarding her age discrimination claim because she has shown that: (1) she was constructively discharged; (2) she was qualified for the position; (3) she was within a protected class; and (4) she was replaced by someone younger.  (D.E. 25 at 8-9).  Similarly, Balderas argues that Myers knew of her disabilities and that the evidence creates a genuine issue of material fact regarding the elements of a disability discrimination claim.  (*Id.* at 9-10).

In order to show a prima facie case of age discrimination based on circumstantial evidence, a plaintiff must show that she: "(1) belongs to the protected group of persons over the age of forty; (2) was qualified for [her] position; (3) was discharged; and (4) was replaced with someone younger or outside the protected group."  *Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 8 (5th Cir. 2009).  As with Title VII claims, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for its disparate treatment.  *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1505 (5th Cir. 1988), *abrogation on other grounds recognized by Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 830 (5th Cir. 2022).  If the employer does so, the burden shifts back to the plaintiff to show that this reason was merely a pretext.  *Id.*

To establish a prima facie case under the Rehabilitation Act, a plaintiff must show that she: "(1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees."  *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 399 (5th Cir. 2012).  "An individual with a disability is any person who (1) has a

physical or mental impairment which 'substantially limits one or more of such person's major life activities'; (2) has a 'record' of such an impairment; or (3) is 'regarded' as having such an impairment." *Hileman v. City of Dallas, Tex.*, 115 F.3d 352, 353 (5th Cir. 1997).

"[A] district court may not grant summary judgment *sua sponte* on grounds not requested by the moving party." *Baker v. Metropolitan Life Ins. Co.*, 364 F.3d 624, 632 (5th Cir. 2004).

Here, the VA has failed to meet its burden to show that no genuine issue of material fact exists regarding Balderas's age and disability discrimination claims.  First, as to Balderas's age discrimination claim, the VA raises only the limited argument that Balderas's claim is based solely on her being the oldest employee in the homeless program and Myers questioning her about early onset dementia, which Myers denied.  (D.E. 21 at 5-6).  The submitted evidence shows that, according to Balderas, Myers questioned her about early onset dementia on three occasions in December 2017, March 2018, and May 2018.  (D.E. 21-1 at 8).  Myers did not ask any of the younger employees this question when they forgot tasks.  (*Id.* at 9).  Myers denied ever asking Balderas if she had been assessed for early-onset dementia.  (D.E. 21-2 at 5).  Thus, Balderas's and Myers's affidavits are inconsistent about whether and how often Myers questioned Balderas about early-onset dementia, and whether Myers questioned younger employees the same way when they forgot to complete tasks.  Resolving this dispute requires a credibility determination that cannot be made by the Court on summary judgment.  *Caboni*, 278 F.3d at 451.

26 / 31

As to her disability discrimination claim, the VA's argument is similarly narrow, contending only that there is no evidence to support that Myers questioned Balderas's mental capacity in relation to the CPR test. (D.E. 21 at 6). However, as with her age discrimination claim, the affidavit evidence is inconsistent. Balderas stated that Myers asked if she had trouble keeping up with the computer instructions during the CPR test, whereas Myers stated that she only discussed physical limitations when talking to Balderas about the test. (D.E. 21-1 at 13; D.E. 21-2 at 8). The Court cannot resolve this factual dispute on summary judgment. *Caboni*, 278 F.3d at 451.

Regarding both the age and disability discrimination claims, the VA has not cited any legal authority or engaged with the applicable legal standards at all. The VA's motion does not address any of the factors necessary to show a prima facie case of age or disability discrimination and does not argue that there was a legitimate, non-discriminatory reason for Balderas's alleged constructive termination. (*See* D.E. 21 at 5-6). As discussed above, the VA raised a legitimate, non-discriminatory reason for Balderas's termination in relation to her Title VII claim, but the motion does not even perfunctorily attempt to extend this argument to Balderas's RA and ADEA claims. (*See id.* at 5-10). Further, although the Title VII claim was addressed first in this memorandum, the VA's motion addresses both the ADEA and RA claims first, and there is accordingly no implication that they were intended as an alternative analysis subsequent to an all-encompassing claim that there was a legitimate, non-discriminatory reason for the termination. (*See id.*).

The Court cannot grant summary judgment on grounds the moving party has not requested. *Baker*, 364 F.3d at 632. Accordingly, it is recommended that the VA's motion be denied as to Balderas's age and disability discrimination claims.

    *d.   Retaliation*

Finally, the VA argues that Balderas has not established illegal retaliation because she did not suffer a materially adverse employment action and, even if she did, she did not participate in any protected activity. (D.E. 21 at 13).

Balderas responds that she sent emails to Wood, Myers, Theriot, and another supervisor in October 2018 in which she asserted that she was being discriminated against based on her age and health and felt isolated. (D.E. 25 at 6-7). She argues that Myers then retaliated against her by limiting face-to-face communications, increasing emails and Skype messages, decreasing her community participation, and calling to verify her presence at outreach facilities. (*Id.* at 7). Balderas contends that the retaliation culminated in Myers submitted a termination proposal. (*Id.* at 7-8). She argues that the emails were protected activity under Title VII and that Myers's subsequent actions, culminating in the letter of proposed termination, were adverse employment actions. (*Id.* at 12-13).

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice … or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a). To establish a prima facie claim of retaliation under Title VII, a

plaintiff must "show that: (1) [s]he engaged in an activity protected by Title VII; (2) [s]he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

"An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (citing 42 U.S.C. § 2000e–3(a)).  In order for a complaint to qualify as protected activity, it must reference what basis the alleged discrimination is on, and complaining about unfair treatment generally is not protected activity. *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011).

Here, Balderas has not established that she engaged in a protected activity, and therefore has not established a prima facie case of retaliation.  The only evidence in the record regarding any potential protected activity is Balderas's statement in her December 2023 affidavit that she sent Dr. Wood a letter in October 2018 in which she "pointed out I was being harassed" and "felt isolated and demoralized."  (D.E. 25-1 at 4).  The evidence does not show that this letter referenced what basis the alleged discrimination was on rather

than merely complaining about unfair treatment generally.[3] *Davis*, 448 F. App'x at 493.  A copy of the letter itself is not part of the summary judgment record.  This evidence is not sufficient to show that there is a genuine issue of material fact regarding whether Balderas participated in a protected activity.

Accordingly, because Balderas has not shown the first prong of a prima facie case of retaliation, it is recommended that the VA's motion be granted on her Title VII retaliation claim.

## IV.   RECOMMENDATION

Accordingly, it is recommended that the VA's motion (D.E. 21) be **GRANTED in part** and **DENIED in part**.

Respectfully submitted on May 7, 2024.

_____
Julie K. Hampton
United States Magistrate Judge

---

[3] Notably, although the allegations in Balderas's complaint are not evidence on summary judgment, the complaint is equally as vague about the contents of the letter. Balderas alleged merely that she sent a letter to Dr. Wood "about the stress she was under at work and requested assistance and advice regarding the adverse treatment towards" her. (D.E. 1 at 9).

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).